UNITED STATES of America, Appellee,

v.

David SEPULVEDA, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Edgar SEPULVEDA, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

William D. WALLACE, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Edward W. WELCH, Jr., Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Kevin CULLINANE, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Christopher DRIESSE, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Richard LABRIE, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Shane WELCH, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Ernest F. LANGLOIS, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Tony ROOD, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Cheryl T. JOHNSON, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Arline S. WELCH, Defendant, Appellant.

Nos. 93–1258 to 93–1263, and
93–1280 to 93–1285.

United States Court of Appeals,
First Circuit.

Heard June 15, 1993.

Decided Dec. 30, 1993.

See also, 15 F.3d 1161; 15 F.3d 1202.

David H. Bownes, Laconia, NH, for appellant David Sepulveda.

Julia M. Nye, Gilford, NH, for appellant Edgar Sepulveda.

Stephen A. Cherry, Henniker, NH, for appellant Edward W. Welch, Jr.

Kevin M. Fitzgerald, Manchester, NH, for appellant Arline S. Welch.

Paul J. Haley, Hillsboro, NH, for appellant Shane Welch.

Michael J. Ryan, Goffstown, NH, for appellant Kevin Cullinane.

John P. Rab, Keene, NH, for appellant Christopher Driesse.

Robert P. Woodward, Manchester, NH, for appellant Cheryl T. Johnson.

Mark H. Campbell, Manchester, NH, for appellant Richard Labrie.

Paul J. Garrity, Londonderry, NH, for appellant Tony Rood.

Matthew J. Lahey, Laconia, NH, for appellant William D. Wallace.

Julie L. Lesher, Laconia, NH, for appellant Ernest F. Langlois.

Terry L. Ollila, Special Assistant United States Attorney, with whom Peter E. Papps, United States Attorney, Concord, NH, was on brief for the United States.

Before SELYA, CYR and BOUDIN, Circuit Judges.

BOUDIN, Circuit Judge.

On June 3, 1991, a jury convicted the 12 defendants in this case of conspiracy to possess cocaine with intent to distribute; one of the defendants, David Sepulveda, was also convicted on a continuing criminal enterprise count. 21 U.S.C. §§ 846, 848. On December 10, 1992, the defendants filed a post-trial motion seeking dismissal or a new trial based on newly discovered evidence. The district court denied the motion in a decision filed February 25, 1993. The defendants appealed separately from the judgments of conviction and from the denial of the post-trial motion, and the cases were consolidated for oral argument.

In *United States v. Sepulveda,* 15 F.3d 1161 (1st Cir., 1993), this court has affirmed the convictions of 10 of the 12 defendants, but vacated two of the sentences and remanded those cases for resentencing.[1] That decision sets forth in detail the factual background of the case but addresses only issues presented on the original appeals from the convictions. In this opinion, we consider the appeals challenging the denial of the defendants' post-trial motion. We conclude that the district court properly denied the motion and that neither a new trial nor a dismissal of the cases was warranted.

Among the more than 30 witnesses who testified for the government at the trial was Joseph Baranski. Baranski testified that he had dealt in cocaine as a user and a retailer and that David Sepulveda had been one of Baranski's sources of supply. Baranski described journeys with David Sepulveda to secure drugs in Nashua, New Hampshire, and estimated that he had bought from him 50 to 60 times in the period 1985–1986. Baranski said that co-defendant Edgar Sepulveda sometimes participated in the trips. Baranski also made brief incriminating references to several other defendants, such as Cullinane and Langlois. The former, said Baranski, supplied one of Baranski's other sources of drugs, and the latter was an enforcer for David Sepulveda.

At trial defense counsel managed to impair Baranski's credibility rather effectively. Baranski denied making any deal with the government that might explain why he was delivering testimony that incriminated him as well as several of the defendants. Instead, he said he was testifying out of friendship with James Noe, who had previously been a business partner with Baranski both in operating a compact disc store in Manchester, New Hampshire, and in cocaine trafficking. Baranski said that Noe, who was also a witness, had asked him to testify and that he had obliged.

Asked whether he had received any compensation from the government, Baranski said that he had been bought a diet soda. The assistant United States attorney then advised defense counsel that records of the Drug Enforcement Administration showed that Baranski had been paid $500 in 1986 and again in 1988 for assisting it in drug arrests or prosecutions. Baranski was recalled for further cross-examination and made to admit the more recent payment; the earlier one he said he did not recall. His testimony included other improbable failures of recollection.

Following the trial and the resulting convictions, defense counsel uncovered a sworn complaint dated September 15, 1992, that Baranski had filed in his own lawsuit against the State of New Hampshire. In that document, Baranski described a raid by New Hampshire state police conducted on February 10, 1988, on Baranski and Noe's compact disc store in Manchester. There the police seized cocaine and about $20,000 in cash. Baranski's complaint said that he had no knowledge of the drug dealing and that all but $1,700 of the funds were proceeds of legitimate business interests.

The complaint went on to say that the law enforcement officers had told Baranski that the bulk of the seized money would not be returned to him unless he was "willing to work it off." Baranski, according to the complaint, then "reluctantly agreed to assist the state in its anti-drug operations. Since the date of the seizure Mr. Baranski has assisted the state of New Hampshire." Baranski's complaint said that the state had returned $6,000 of the money to him but declined to return the rest. The complaint sought "the balance" of the money as an unconstitutional taking of property.[2]

In their motion filed on December 10, 1992, the defendants argued that the information set forth in Baranski's complaint was newly discovered evidence of great signifi-

---

1. In *United States v. Welch,* 15 F.3d 1202 (1st Cir.1993), filed simultaneously with this opinion, this court has affirmed the convictions of the remaining two defendants but remanded one of the two cases for resentencing.

2. Based on this information, defense counsel then searched the state court records pertaining to the search warrant that had authorized the raid of February 10, 1988. A state police property receipt showed that the amounts specified in Baranski's complaint had indeed been seized.

cance. The motion claimed that the information constituted *Brady* material of which the prosecution knew, or should have known, either directly or through its agents.[3] Defense counsel charged the government with misconduct and argued that during his testimony Baranski had concealed his relationship with law enforcement authorities and his compensation arrangements concerning the seized money. The remedy, defendants urged, was either dismissal of the cases or a new trial.

A flurry of further filings followed. The prosecutors denied that they or the case agents assisting them had during the trial any knowledge of an arrangement between Baranski and the state police for him to cooperate with law enforcement authorities. The government also argued that the additional impeaching effect of such information, if true, would not conceivably have altered the outcome of the trial, given the limited role of Baranski's testimony and the parade of witnesses against the defendants. Defense counsel filed a broad-gauged motion to produce including all materials related to any agreements with Baranski or Noe as to the return of the seized money.

On February 25, 1993, the district court denied the motion for dismissal or a new trial. It ruled that the record provided an adequate basis for resolving the motion. The court pointed out that Noe had testified at trial and disclosed the search of his business premises in the February 1988 raid; since the records of the raid were not sealed, the court said that defense counsel, knowing of the raid, could have secured the information about the funds seizure themselves. Accordingly, the court declined to describe the evidence as "newly discovered," implying that due diligence by defense counsel would have uncovered the information in time for trial.

The court also said that Baranski's own trial testimony had shown him to be a witness of "dubious" credibility. The additional information provided by the Baranski state court complaint was, at most, additional impeaching evidence. The court said that the additional evidence if presented to the jury would not likely have altered the outcome of the trial, so that the defendants had failed to make the minimum necessary showing for a new trial. Indeed, the district court indicated that there was no reasonable possibility that the evidence would have had altered the outcome.

██ We agree with the district court that even the complete discrediting and elimination of Baranski's testimony would not have changed the outcome in this case, and that alone is basis enough to affirm the court's denial of the motion. The defense may have a plausible argument that even if a diligent pre-trial search had uncovered the state police records of the search and seizure of the funds, these facts would not have disclosed the supposed "work it off" arrangement alleged in Baranski's complaint. Nevertheless, as we explain below, new trials based on newly discovered evidence, or on evidence withheld by the prosecution, require specified showings as to the likelihood of a different result. The defense has not made those showings.

We start by putting to one side any claim that the government engaged in deliberate misconduct. The prosecutors represented that neither they nor any of the case agents were aware of any deal between Baranski and the New Hampshire authorities that Baranski would regain seized funds by cooperating with the state or anyone else. The district court accepted this representation, and nothing said in the defense briefs gives us any reason to question it or to approve the fishing expedition proposed by the defense motion to produce.

What we have is evidence that might have been useful to defense counsel in seeking further to discredit Baranski. Primarily, his state court complaint, if believed, suggests a continuing link with *state* law enforcement authorities that endured during the trial of this case and a desire to curry favor with state authorities in order to recover more of

---

**3.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), is the standard statement of the prosecutor's obligation to turn over exculpatory material. In *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court said that the obligation includes evidence that would impeach the credibility of government witnesses.

his funds. It is not apparent that helpful testimony by Baranski in this federal prosecution would have been treated as cooperation by the state or facilitated the recovery, but defense counsel could have cross-examined on this point and the jury might have believed that Baranski would benefit from his testimony.

Further, information derived from the state court complaint might have been used to bolster the impression that Baranski was lying at trial in his vague and equivocal statements about his prior links with law enforcement. It is not clear that the state court complaint, or for that matter the two $500 payments by DEA to Baranski for earlier cooperation, are literally inconsistent with Baranski's trial testimony.[4] Still, as with the $500 payments from DEA, Baranski's failure to disclose the alleged arrangement with the state police would probably have been portrayed as discrediting, and the jury might have drawn such an inference.

■ Thus, we have no difficulty in regarding the evidence as potentially useful to the defense, although less damning than the defense brief suggests. The difficulty for the instant appeals starts with the reasonably high barriers erected by case law when a defendant seeks a new trial based on newly discovered evidence. If it is new evidence unconnected with the government, then—other requisites aside—the evidence must create an actual probability that an acquittal would have resulted if the evidence had been available. *United States v. Slade*, 980 F.2d 27, 29 (1st Cir.1992); *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir.1980).

Where the government possessed the evidence but did not disclose it, a statement of the rule is more difficult, in part because the leading Supreme Court case produced two plurality opinions. *United States v. Bagley,*

473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The usual locution, taken from Justice Blackmun's opinion in *Bagley,* is that the nondisclosure justifies a new trial if it is "material," it is "material" only if there is "a reasonable probability" that the evidence would have changed the result, and a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* at 682, 105 S.Ct. at 3383.

This somewhat delphic "undermine confidence" formula suggests that reversal might be warranted in some cases even if there is less than an even chance that the evidence would produce an acquittal. After all, if the evidence is close and the penalty significant, one might think that undisclosed evidence creating (for example) a 33 percent chance of a different result would undermine one's confidence in the result. And while *Bagley* appears to give little weight to other factors—such as the degree of fault on the prosecutor's part and the specificity of the defense request—it is not entirely clear that these variables must be ignored. *Cf. Bagley,* 473 U.S. at 680–82, 105 S.Ct. at 3382–83 (Blackmun, J.) and 685 (White, J.).

In all events, we need not wrestle with these uncertainties in this case. We will assume *arguendo* (but with little basis in this record) that the federal prosecutors or their agents knew or should have known of the information in question. Nevertheless, we agree with the district court that the likelihood of a different outcome, if the additional information had been available ·to defense counsel, is extremely slight and does not remotely undermine our confidence in the verdicts. Thus, whichever standard is applied—whether for newly discovered evidence or negligently withheld evidence—the result in this case is the same.[5]

---

4. Baranski's reference to a diet soda was made in response to rather loosely worded questions. The two $500 payments were apparently for his assistance on prior occasions, and the defense brief points to no clear evidence that Baranski had any deal with any law enforcement agency as to *this* case, or received any .compensation apart from the diet soda for his testimony in *this* case.

5. Neither our decisions nor those of other circuits have been sympathetic to new trial claims based solely on the discovery of additional information useful for impeaching a government witness, *e.g., United States v. Formanczyk,* 949 F.2d 526, 531 (1st Cir.1991); *United States v. Burroughs,* 830 F.2d 1574, 1578–79 (11th Cir.1987), although we do not read the cases to say that such evidence can never be sufficient.

 

The only important testimony offered by Baranski against any of the defendants concerned the Sepulvedas' own trafficking and Baranski's trips with them while both, or in some cases David Sepulveda alone, obtained cocaine for Baranski in Nashua, New Hampshire. Quite similar testimony, however, was provided by Noe himself. It is not apparent why Baranski's self-described cooperation with state authorities (even if true) discredits Noe's testimony.[6] In any event, other witnesses testified to various cocaine collection trips by the Sepulvedas, and there is no serious basis for doubting that they occurred.

The defendants assert that Baranski and Noe furnished a critical link in the evidence by establishing the Sepulvedas' activities in 1985 and 1986—the principal period of these witnesses' trips with the Sepulvedas—so that these activities could be connected to the drug trafficking of the Sepulvedas in 1987 and thereafter. This, say the defendants, helped the government establish the single conspiracy covering the entire period as charged in the indictment. But in fact another drug dealer witness, Michael Lacerte, described his drug dealings with David Sepulveda in 1985 and 1986, and his testimony was corroborated in different respects by various law enforcement agents. The "critical link" argument is inventive but not persuasive.

Defendants argue for a more favorable—that is, less demanding—test of likelihood that the outcome would have been different if the new information had been available, citing our decision in *United States v. Wright*, 625 F.2d 1017 (1st Cir.1980). There, the court described the ordinary requisites for a new trial based on newly discovered evidence, including the requirement that the defendant show that the new evidence would probably have altered the result. However, *Wright* went on to say that where a defense witness is shown by post-trial evidence to

have testified falsely, it may be enough to justify a new trial for the defendant to show that the result "might" have been different without the false testimony. *Id.* at 1020.[7]

The defendants, as already noted, overstate the force of the new information: it does not demonstrate that Baranski gave false testimony at trial. It is not even clear that the new information seriously compromises Baranski's credibility, although it opens a line of attack that defendants might have exploited. We will assume for present purposes that *Wright* establishes a special rule with a more favorable standard where post-trial evidence shows that an important witness lied at trial. Still, such a rule has no application in this case because the state court complaint does not show that Baranski lied at trial.

The appeals from the denial of the post-trial motion have been vigorously pursued by able defense counsel. The joint defendants' brief, and our own reading of all of Baranski's trial testimony, confirm the trial judge's assessment that Baranski's credibility was dubious. But almost all the material for making that assessment was available to the jury, and the new information derived from Baranski's state court complaint added very little. In the end, there is less to the defense argument than first meets the eye, and certainly not enough to "undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.

*Affirmed. The stay of mandate previously entered in United States v. Sepulveda, No. 92–1362, et al. (1st Cir., Dec. 20, 1993), is dissolved.*

**6.** A New Hampshire state police receipt, apparently located by the federal prosecutors after this trial and provided to defense counsel, indicates that $10,000 of the seized funds were returned to Noe on February 12, 1990, two days after the raid. There is no basis for inferring that this return of funds was contingent on, or in any way related to, Noe's testimony in this case which occurred more than a year later.

**7.** *Wright* derived this "arguably applicable" standard for perjured testimony from a 1928 Seventh Circuit decision, *Larrison v. United States*, 24 F.2d 82 (7th Cir.1928). *See* 625 F.2d at 1020.